**Raymond J. DONOVAN, Secretary of the United States Department of Labor, Plaintiff-Appellant-Cross Appellee,**

v.

**C. H. DILLINGHAM, C. H. Dillingham, III, W. Lamar Mathis, National Administrators, Inc. and Time Control, Inc., Defendants-Appellees-Cross Appellants.**

No. 80–7879.

United States Court of Appeals, Eleventh Circuit.

Oct. 15, 1982.

Margaret M. Topps, Norman P. Goldberg, Edward A. Scallet, U. S. Dept. of Labor, Washington, D. C., for plaintiff-appellant-cross appellee.

Lloyd A. Fox, Law Firm of Stokes & Shapiro, Atlanta, Ga., for defendants-appellees-cross appellants.

(ON REHEARING EN BANC)

Before GODBOLD, Chief Judge, RONEY, TJOFLAT, HILL, FAY, VANCE, KRAVITCH, JOHNSON, HENDERSON, HATCHETT, ANDERSON and CLARK, Circuit Judges.

GODBOLD, Chief Judge:

The Secretary of Labor pursuant to his authority under ERISA[1] § 502(a), 29 U.S.C. § 1132(a), brought this action against the trustees of Union Insurance Trust (UIT) and businesses owned and operated by them, alleging they are fiduciaries[2] subject to the fiduciary responsibility provisions contained in Part 4 of Title I of ERISA, 29 U.S.C. §§ 1101 et seq. Fiduciary duties under ERISA, however, arise only if there are employee benefit plans as defined

---

1. Employee Retirement Income Security Act of 1974, P.L. No. 93–406, 88 Stat. 829 (codified at 29 U.S.C. §§ 1001 et seq. (1976)).

2. Except for investment companies registered under the Investment Company Act of 1940, and their employees, pertaining to securities issued by the investment company, ERISA deems any person to be a fiduciary with respect to an employee benefit plan to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21), 29 U.S.C. § 1002(21).

by the Act. The district court held that this case is controlled by *Taggart Corp. v. Life & Health Benefits Administration,* 617 F.2d 1208 (5th Cir. 1980), *cert. denied sub nom. Taggart Corp. v. Efros,* 450 U.S. 1030, 101 S.Ct. 1739, 68 L.Ed.2d 225 (1981), and dismissed for lack of subject matter jurisdiction because there were no employee benefit plans involved. A panel of this court agreed. *Donovan v. Dillingham,* 668 F.2d 1196 (11th Cir. 1982).[3] Upon reconsideration en banc we find there was subject matter jurisdiction and reverse.

## I.

Congress enacted ERISA to protect working men and women from abuses in the administration and investment of private retirement plans and employee welfare plans. Broadly stated, ERISA established minimum standards for vesting of benefits, funding of benefits, carrying out fiduciary responsibilities, reporting to the government and making disclosures to participants. *See generally* H.R. Rep. No. 93–533, 93d Cong. 2d Sess., *reprinted in* [1974] U.S. Code Cong. & Ad. News 4639.

With a few specific exceptions not pertinent to this decision, Title I of ERISA applies to any "employee benefit plan" if it is established or maintained by any employer or employee organization engaged in commerce or in any industry or activity affecting commerce, or by both an employer and an employee organization. ERISA § 4(a), 29 U.S.C. § 1003(a). "Employee benefit plan" or "plan" means an "employee welfare benefit plan" or an "employee pension benefit plan" or a plan which is both a welfare plan and a pension plan. ERISA § 3(3), 29 U.S.C. § 1002(3).

UIT is a group insurance trust, commonly known as a multiple employer trust ("MET"), whose purpose is to allow employers of small numbers of employees to secure group health insurance coverage for their employees at rates more favorable than offered directly by an insurer. UIT obtained a group health insurance policy from Occidental Life Insurance Company of California to furnish specified insurance benefits. Employers and various employee organizations "subscribe" to UIT to receive the coverage of the blanket Occidental Life policy. Appellees contend that ERISA does not apply because there is involved only the "bare purchase of health insurance" and that no employee welfare benefit plans are implicated. The parties have debated whether UIT is a fiduciary and how that status or lack thereof bears on the presence of an employee welfare benefit plan. We agree with the Secretary that whether UIT merely sells insurance or is a fiduciary does not determine whether employee welfare benefit plans exist. Likewise, we agree with appellees that the existence of appellees' management of the trust or their falling within ERISA's fiduciary definition (which they challenge) does not necessarily mandate a finding that employee welfare benefit plans exist.

## II.

■ ERISA § 3(1), 29 U.S.C. § 1002(1), defines "employee welfare benefit plan" or "welfare plan" as

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, acci-

---

**3.** The Eleventh Circuit has adopted as precedent the decisions of the former Fifth Circuit handed down before October 1, 1981, unless Eleventh Circuit en banc or Supreme Court decisions subsequently have considered the is-sue. *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir. 1982); *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

dent, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in § 302(c) of the Labor Management Relations Act, 1947 (other than pensions on retirement or death, and insurance to provide such pensions).[4]

By definition, then, a welfare plan requires (1) a "plan, fund, or program" (2) established or maintained (3) by an employer or by an employee organization, or by both, (4) for the purpose of providing medical, surgical, hospital care, sickness, accident, disability, death, unemployment or vacation benefits, apprenticeship or other training programs, day care centers, scholarship funds, prepaid legal services or severance benefits (5) to participants or their beneficiaries.

### A.

■ Prerequisites (3), (4) and (5) are either self-explanatory or defined by statute.

A plan, fund, or program must be established or maintained "for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise," health, accident, disability, death, or unemployment or vacation benefits or apprenticeship or other training programs, day care centers, scholarship funds, prepaid legal services or severance benefits.[5]

■ The gist of ERISA's definitions of employer,[6] employee organization,[7] participant,[8] and beneficiary [9] is that a plan, fund, or program falls within the ambit of ERISA only if the plan, fund, or program covers ERISA participants because of their employee status in an employment relationship, and an employer or employee organization is the person that establishes or maintains the plan, fund, or program. Thus, plans, funds, or programs under which no union members, employees or former employees participate are not employee welfare benefit plans under Title I of ERISA. *See* 29 C.F.R. 2510.3–3(b), (c).

---

4. The ERISA definition refers to benefits in § 302(c) of the Labor Management Relations Act, 1947 (codified at 29 U.S.C. § 186(c)). The Secretary in regulations says § 302, 29 U.S.C. § 186(c), duplicates to a large extent the benefits enumerated in ERISA § 3(1)(A), 29 U.S.C. § 1002(1)(A), except that § 302, 29 U.S.C. § 186(c), adds holiday and severance benefits. 29 C.F.R. § 2510.3–1(a)(3).

5. A plan, fund, or program furnishing both benefits listed in ERISA § 3(1), 29 U.S.C. § 1002(1) or § 302(c) of the Labor Management Relations Act, 29 U.S.C. § 186(c), and benefits not listed in those sections, is subject to ERISA to the extent the plan, fund, or program has as its purpose the providing of the enumerated benefits.

6. The term "employer" means any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a group or association of employers acting for an employer in such capacity. ERISA § 3(5), 29 U.S.C. § 1002(5).

7. The term "employee organization" means any labor union or any organization of any kind, or any agency or employee representation

committee, association, group, or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning an employee benefit plan, or other matters incidental to employment relationships; or any employees' beneficiary association organized for the purpose in whole or in part, of establishing such a plan. ERISA § 3(4), 29 U.S.C. § 1002(4).

8. The term "participant" means any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit. ERISA § 3(7), 29 U.S.C. § 1002(7). The term "employee" means any individual employed by an employer. ERISA § 3(6), 29 U.S.C. § 1002(6).

9. The term "beneficiary" means a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder. ERISA § 3(8), 29 U.S.C. § 1002(8).

An issue in other cases has been whether a multiple employer trust—the enterprise—is itself an employee welfare benefit plan. The courts, congressional committees, and the Secretary uniformly have held they are not. *See, e.g., Activity Report of the Comm. on Education and Labor,* H.R. Rep. No. 94–1785, 94th Cong. 2d Sess. 48 (1977); *Taggart Corp. v. Life & Health Benefits Administration, Inc.,* 617 F.2d 1208 (5th Cir. 1980), *cert. denied sub nom. Taggart Corp. v. Efros,* 450 U.S. 1030, 101 S.Ct. 1739, 68 L.Ed.2d 225 (1981); *Wayne Chemical, Inc. v. Columbus Agency Service Corp.,* 567 F.2d 692 (7th Cir. 1977); *Bell v. Employee Security Benefit Ass'n,* 437 F.Supp. 382 (D. Kan. 1977). All parties to this appeal agree that UIT is subject to state laws regulating insurance and is not itself an employee welfare benefit plan.[10]

### B.

Not so well defined are the first two prerequisites: "plan, fund, or program" and "established or maintained." Commentators and courts define "plan, fund, or program" by synonym—arrangement, scheme, unitary scheme, program of action, method of putting into effect an intention or proposal, design—but do not specify the prerequisites of a "plan, fund, or program." At a minimum, however, a "plan, fund, or program" under ERISA implies the existence of intended benefits, intended beneficiaries, a source of financing, and a procedure to apply for and collect benefits.

"Established or maintained" appears twice in the definition of an employee welfare benefit plan: first, an employer or employee organization or both must establish or maintain a plan, fund, or program, and, second, the plan, fund, or program must be established or maintained for specified purposes. In many instances a plan is established or maintained, or both, in writing. It is obvious that a system of providing benefits pursuant to a written instrument that satisfies ERISA §§ 102 and 402, 29 U.S.C. §§ 1022 and 1102, would constitute a "plan, fund or program."

ERISA does not, however, require a formal, written plan. ERISA's coverage provision reaches "*any* employee benefit plan if it is established or maintained" by an employer or an employee organization, or both, who are engaged in any activities or industry affecting commerce. ERISA § 4(a), 29 U.S.C. § 1003(a) (emphasis added). There is no requirement of a formal, written plan in either ERISA's coverage section, ERISA § 4(a), 29 U.S.C. § 1003(a), or its definitions section, ERISA § 3(1), 29 U.S.C. § 1002(1). Once it is determined that ERISA covers a plan, the Act's fiduciary and reporting provisions do require the plan to be established pursuant to a written instrument, ERISA §§ 102 and 402, 29 U.S.C. §§ 1022 and 1102; but clearly these are only the responsibilities of administrators and fiduciaries of plans covered by ERISA and are not prerequisites to coverage under the Act. Furthermore, because the policy of ERISA is to safeguard the well-being and security of working men and women and to apprise them of their rights and obligations under any employee benefit plan, *see* ERISA § 2, 29 U.S.C. § 1001, it would be incongruous for persons establishing or maintaining informal or unwritten employee benefit plans, or assuming the responsibility of safeguarding plan assets, to circumvent the Act merely because an administrator or other fiduciary failed to satisfy reporting or fiduciary standards. *Accord, Dependahl v. Falstaff Brewing Corp.,* 491 F.Supp. 1188, 1195 (E.D. Mo. 1980), *aff'd* 653 F.2d 1208 (8th Cir. 1981).

The Secretary contends that "establish" means no more than an ultimate deci-

---

10. UIT, even though it is not an employee benefit welfare plan, may nonetheless be subject to ERISA's fiduciary responsibilities if it is a fiduciary to employee benefit plans established or maintained by other entities. *See Eversole v.* *Metropolitan Life Insurance Co.,* 500 F.Supp. 1162, 1170 (C.D. Cal. 1980). UIT is not a defendant in this case; the trustees of UIT are, however.

sion by an employer or an employee organization to provide the type of benefits described in ERISA § 3(1), 29 U.S.C. § 1002(1). This sweeps too broadly. A decision to extend benefits is not the establishment of a plan or program. Acts or events that record, exemplify or implement the decision will be direct or circumstantial evidence that the decision has become reality—e.g., financing or arranging to finance or fund the intended benefits, establishing a procedure for disbursing benefits, assuring employees that the plan or program exists—but it is the reality of a plan, fund or program and not the decision to extend certain benefits that is determinative.

■ In determining whether a plan, fund or program (pursuant to a writing or not) is a reality a court must determine whether from the surrounding circumstances a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits. Some essentials of a plan, fund, or program can be adopted, explicitly or implicitly, from sources outside the plan, fund, or program —e.g., an insurance company's procedure for processing claims, cf. 29 C.F.R. § 2520.-102–5 (qualified health maintenance organization)—but no single act in itself necessarily constitutes the establishment of the plan, fund, or program. For example, the purchase of insurance does not conclusively establish a plan, fund, or program, but the purchase is evidence of the establishment of a plan, fund, or program; the purchase of a group policy or multiple policies covering a class of employees offers substantial evidence that a plan, fund, or program has been established.[11]

## C.

■ In summary, a "plan, fund, or program" under ERISA is established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits. To be an *employee* welfare benefit plan, the intended benefits must be health, accident, death, disability, unemployment or vacation benefits, apprenticeship or other training programs, day care centers, scholarship funds, prepaid legal services or severance benefits; the intended beneficiaries must include union members, employees, former employees or their beneficiaries; and an employer or employee organization, or both, and not individual employees or entrepreneurial businesses, must establish or maintain the plan, fund, or program.

## III.

■ The record[12] indicates that subscribers to UIT included single-employer, collectively bargained programs, multi-employer health and welfare funds, and union-sponsored funds. For some organizations the subscription to UIT was their initial subscription—e.g., Carpenters Local # 865 (377 members), Rahn's Trucking (4 employees), and Porter Contracting Co., Inc. (8

---

**11.** Department of Labor regulations recognize that an employer may be involved in a plan, fund, or program without establishing or maintaining it. *See* 29 C.F.R. § 2510.3–1(j). According to the regulation the term "employee welfare benefit plan" does not include group insurance if the sole functions of the employer are, without endorsing the program, to permit an insurer to publicize a program to employees, to collect premiums through payroll deductions, and to remit the premiums to the insurer, and the employer does not contribute premiums to the insurer or make a profit from the program. *See also Hamberlin v. VIP Insurance Trust,* 434 F.Supp. 1196 (D. Ariz. 1977) (policies sold directly to individual employees; em-

ployers had no voice in management and contributed no funds).

**12.** The Secretary filed with the district court, by affidavit, copies of "participation agreements" and "subscriptions to trust" that it stated had been seized from appellees' offices pursuant to a search warrant. Though not formally in evidence the district court considered them in acting on the motion to dismiss. Appellees have not objected to the manner these documents were presented to the district court, or to their use in the order ruling in their favor. Therefore, we consider them on appeal.

employees). Most subscribers, however, replaced other METs or carriers with UIT—e.g., Alabama Metal Industries Corp. (5 employees) replaced Blue Cross/Blue Shield, Clean Rental Services, Inc. (35 employees) replaced Central States Teamster Union, and Atlanta Glaziers Local Union # 1940 Health and Welfare Fund (91 members) replaced Durham Life Insurance Co.

Without inquiring into other assets or purposes of the subscribers, the purpose stated in the Agreement and Declaration of Trust establishing UIT and thus the purpose of those who subscribed to UIT, was "to provide, through policies issued by insurers, life, accident-and-health, sickness-and-health, disability-income, hospital benefits, surgical-benefits, dental-care, and pre-paid-legal-expenses insurance for the use and the benefit of insured employees and of their families and dependents." The group health insurance policy UIT obtained from Occidental Life Insurance Company of California may provide less benefits than those listed in the UIT trust agreement, but clearly employers and employee organizations subscribe to UIT with the intent to provide health insurance, which is covered by ERISA § 3(1), 29 U.S.C. § 1002(1). It is equally clear from participation agreements found in the record that the persons benefiting from the group hospitalization are employees of employers or members of the employee organizations that subscribed to UIT and are financing the participation.

Many of the subscriptions were methods of fulfilling collective bargaining agreements between employers and unions to furnish health insurance benefits to employees.[13] In these situations the employer or employee organization, or both, were committed to providing benefits to employees or members through the purchase of health insurance on a continuing basis. In some cases, as noted above, unions or employers were already furnishing insurance benefits and merely substituted UIT for other METs or carriers while continuing to furnish health insurance coverage.

Finally, as stipulated in the Articles of Trust of UIT, the subscribers, the beneficiaries, and UIT itself looked to the group health insurance policy and insurer to determine the eligibility requirements to receive benefits and "all other terms, conditions, limitations, restrictions, and provisions applicable to a policy of group insurance." This common sense approach adequately serves the needs of most employers and unions seeking to provide health insurance to employees at an ascertainable cost; they can agree to furnish only what the insurer contracts to furnish and avoid any unforeseen liability for, or denial of, benefits to employees. For the same reasons employers and unions normally will not require any procedures in addition to those required by the insurer.

Thus, it appears that employers or unions that subscribed to UIT to furnish health insurance for employees or members (either pursuant to an agreement or pursuant to a continuing practice of purchasing the insurance for a class of employees) established[14] employee welfare benefit plans. It also appears that some subscribers that previously had not furnished health insurance to their employees or members, and that did not subscribe to UIT pursuant to an agreement to furnish health benefits, nevertheless did purchase benefits for a substantial percentage of a class of employees or mem-

---

**13.** The record contains no collective bargaining agreements. The Secretary states without contradiction that many subscriptions were to honor collectively bargained for commitments. Additionally, many subscribers to UIT signed "participation agreements" that acknowledged the employer entered into a collective bargaining agreement or a National Pipe Line Agreement with a union, usually the International Brotherhood of Teamsters.

**14.** Since this case went off on jurisdictional grounds without a full-blown trial, and we find that jurisdiction exists with respect to numerous plans that have been "established," we do not attempt to cover the issue of whether any plans may have been "maintained." This is more appropriately for the district court.

bers under circumstances tending to show an anticipated continuing furnishing of such benefits (either through an MET or insurance carrier or otherwise); these subscribers too established employee welfare benefit plans. Thus, it appears that numerous subscribers to UIT established employee welfare benefit plans; with respect to each of these, ERISA conferred subject matter jurisdiction on the district court.[15]

## IV.

The former Fifth Circuit in *Taggart Corp. v. Life & Health Benefits Administration,* 617 F.2d 1208 (5th Cir. 1980), *cert. denied sub nom. Taggart Corp. v. Efros,* 450 U.S. 1030, 101 S.Ct. 1739, 68 L.Ed.2d 225 (1981), held that the MET, which was providing group insurance to employers too small to qualify for group rates on their own, was not itself an employee welfare benefit plan and that Taggart Corporation's subscription to the MET to furnish insurance coverage to Taggart Corporation's sole employee did not constitute a "plan, fund, or program" within the meaning of ERISA § 3(1), 29 U.S.C. § 1002(1).

We agree with the holding and reasoning of the former Fifth that the MET itself was not an employee welfare benefit plan, *see Taggart,* 617 F.2d at 1210. We also agree that there was no employee welfare benefit plan in *Taggart.* Plaintiffs Kansas and Taggart Corporation alleged that the MET was the welfare plan. Neither party argued that Taggart Corporation had a plan, fund, or program. *Taggart,* 617 F.2d at 1211.[16] Moreover, the *Taggart* district court appeared to agree with the parties that Taggart Corporation did not have a welfare plan when it found that the MET insured some employees directly and the

"circumstances surrounding the submission of the subscription agreement by Stanley M. Kansas ... simply involve[d] the purchase of insurance by plaintiff, Stanley M. Kansas, for himself and his family." *Taggert [sic] Corporation v. Efros,* 475 F.Supp. 124 (S.D.Tex.1979), *aff'd. sub nom. Taggart Corp. v. Life & Health Benefits Administration,* 617 F.2d 1208 (5th Cir. 1980), *cert. denied,* 450 U.S. 1030, 101 S.Ct. 1739, 68 L.Ed.2d 225 (1981). The district court's findings of fact were not clearly erroneous, and under those facts the district court was entitled to conclude that Taggart Corporation's involvement in the transaction was not such that it established or maintained a plan, fund, or program. *See also Hamberlin v. VIP Insurance Trust,* 434 F.Supp. 1196 (D. Ariz. 1977); 29 C.F.R. § 2510.3-1(j); note 13 *supra.*

Although we agree with the holding in *Taggart,* we find the reasoning of the opinion that Taggart Corporation did not have a "plan, fund or program" encourages too broad an interpretation. If *Taggart* is interpreted to mean ERISA does not regulate purchases of health insurance when there is no welfare plan, we agree. The purchase of insurance is only a method of implementing a plan, fund, or program and is evidence of the existence of a plan but is not itself a plan. If *Taggart* implies that an employer or employee organization that only purchases a group health insurance policy or subscribes to a MET to provide health insurance to its employees or members cannot be said to have established or maintained an employee welfare benefit plan, we disagree. To that extent *Taggart* shall no longer be binding in the Eleventh Circuit.

## V.

We hold only that the district court had subject matter jurisdiction over this case.

**15.** This is not to say that all subscribers to UIT established employee welfare benefit plans. The record contains numerous subscriptions to UIT that do reflect the existence of ERISA plans, but it is not clear from the record that all subscribers to UIT had established an employee benefit welfare plan.

**16.** The Secretary of Labor on appeal in an amicus brief contended the subscription to the MET itself established a single employer welfare plan. The parties to the suit "refrained from adopting the Secretary's line of argument.". *Taggart,* 617 F.2d at 1211.

We have not determined how many subscribers established or maintained plans or if any defendant is a fiduciary to any plan. The judgment of the district court dismissing the case is REVERSED and the case is REMANDED for proceedings not inconsistent with this opinion.

